Adeel A. Mangi (*pro hac vice* application to be submitted)
Muhammad U. Faridi (*pro hac vice* application to be submitted)
Matthew Funk (NJ Bar # 043922010)
Peter Shakro (*pro hac vice* application to be submitted)
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036
Telephone: 212-336-2000
Facsimile: 212-336-2222

*Attorneys for Plaintiffs Bayonne Muslims,*
*Abdul Hameed Butt, and Khaled Aly*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAYONNE MUSLIMS, ABDUL HAMEED BUTT, and KHALED ALY, | Civil Action No. _____ |
| *Plaintiffs*, | |
| *v.* | **COMPLAINT** |
| CITY OF BAYONNE, CITY OF BAYONNE ZONING BOARD OF ADJUSTMENT, MARK URBAN, in his official capacity, CLIFFORD ADAMS, in his official capacity, JAN PATRICK EGAN II, in his official capacity, VINCENT J. LeFANTE, in his official capacity, LOUIS LOMBARI, in his official capacity, FRANK PELLITTERI, in his official capacity, MATT DORANS, in his official capacity, JOSEPH PINEIRO, in his official capacity, JAMES O'BRIEN, JR., in his official capacity, and NICHOLAS DiLULLO, in his official capacity, | |
| *Defendants*. | |

9665173

## TABLE OF CONTENTS

**PAGE**

Table of Figures ............................................................................................ iv

Local Civil Rule 10.1 Statement of Party Addresses ...................................... v

Introduction .................................................................................................... 1

Jurisdiction and Venue .................................................................................... 8

The Parties ...................................................................................................... 8

    A.    Plaintiff Bayonne Muslims ................................................... 8

    B.    Plaintiff Abdul Hameed Butt ............................................... 8

    C.    Plaintiff Khaled Aly ............................................................ 9

    D.    Defendant City of Bayonne .................................................. 9

    E.    Defendant Zoning Board of Adjustment .............................. 9

    F.    The Individual Defendants .................................................. 10

Overview of Applicable Law .......................................................................... 10

    A.    The Religious Land Use and Institutionalized Persons Act ................................. 10

    B.    The First and Fourteenth Amendments to the U.S. Constitution and the New Jersey Constitution ............................................................ 12

    C.    The New Jersey Municipal Land Use Law ......................... 12

The Facts ........................................................................................................ 14

    A.    Bayonne Muslims Do Not Have a Facility Where Its Members Can Worship In Compliance With Their Islamic Faith .................................. 14

    B.    Bayonne Muslims Searched for a Permanent Spiritual Home for Years Before Settling on an Abandoned Factory ............................... 18

    C.    Bayonne Muslims Announce Plan to Convert the Abandoned Warehouse into a Mosque ............................................ 20

    D.    Bayonne Muslims' Plan is Met with Hostility ..................... 24

    E.    The Objectors Refuse Meetings with Bayonne Muslims to Address Any Legitimate Land Use Concerns ........................... 31

    F.    Bayonne Muslims Face Animus and Hostility During Zoning Board Hearings ... 32

**TABLE OF CONTENTS**
**(CONTINUED)**

**PAGE**

G.    The Zoning Board Denies Bayonne Muslims' Request for Variance Relief.........35

    1.    Denial of Conditional Use Variance ........................................................36

    2.    Denial of Parking Variance....................................................................42

    3.    Denial of Curb Cut Width and Parking Area Set-Back Variances ...........51

H.    Individualized Assessment and Impact on Interstate Commerce .........................52

First Cause of Action ...................................................................................................53

Second Cause of Action................................................................................................53

Third Cause of Action ..................................................................................................54

Fourth Cause of Action ................................................................................................55

Fifth Cause of Action...................................................................................................56

Sixth Cause of Action ..................................................................................................57

Seventh Cause of Action...............................................................................................58

Eighth Cause of Action ................................................................................................59

Ninth Cause of Action
(Pleaded in the Alternative) .........................................................................................60

Tenth Cause of Action
(Pleaded in the Alternative) .........................................................................................61

Prayer for Relief...........................................................................................................62

9665173

**TABLE OF FIGURES**

**PAGE**

Figure 1:  Churches and Temples in Bayonne ...................................................................15

Figure 2:  Bayonne Muslims Entering Basement of the St. Henry's Facility...............................17

Figure 3:  *Jumma* Prayer in the Basement of the St. Henry's Facility.........................................17

Figure 4:  The Property (109 East 24 Street, Bayonne, NJ) (1 of 2) .............................................19

Figure 5:  The Property (109 East 24 Street, Bayonne, NJ) (2 of 2) .............................................19

Figure 6:  Overview of the Property's Surroundings.......................................................................21

Figure 7:  Current State of the Property (1 of 4)..............................................................................22

Figure 8:  Current State of the Property (2 of 4)..............................................................................22

Figure 9:  Current State of the Property (3 of 4)..............................................................................22

Figure 10:  Current State of the Property (4 of 4)............................................................................22

Figure 11:  Exterior View of the Property (1 of 2) ..........................................................................23

Figure 12:  Exterior View of the Property (2 of 2) ..........................................................................23

Figure 13:  Picture Posted on Facebook Group "Stop the Mosque in Bayonne" .........................27

Figure 14:  Bayonne Times Ad Encouraging Boycott of Yellow Cab and Judicke's Bakery.......28

Figure 15:  Billboard Encouraging Boycott of Yellow Cab and Judicke's Bakery......................29

Figure 16:  "No Más!  No Mosque" Flyer .......................................................................................30

Figure 17:  Graffiti at the St. Henry's Facility................................................................................31

Figure 18:  Signs Held by Mosque Opponents ...............................................................................33

Figure 19:  Objectors Questioning Bayonne Muslims' Witnesses at Heavily Attended Meetings of the Zoning Board (1 of 2) ..........................................................................................................34

Figure 20:  Objectors Questioning Bayonne Muslims' Witnesses at Heavily Attended Meetings of the Zoning Board (2 of 2) ..........................................................................................................34

iv

9665173

**LOCAL CIVIL RULE 10.1 STATEMENT OF PARTY ADDRESSES**

Plaintiff Bayonne Muslims has a business address of 109 East 24 Street, Bayonne, New Jersey 07002.  Plaintiff Abdul Hameed Butt serves as the President of Bayonne Muslims, and has a business address of 109 East 24 Street, Bayonne, New Jersey 07002.  Plaintiff Khaled Aly serves as the Vice President of Bayonne Muslims, and has a business address of 109 East 24 Street, Bayonne, New Jersey 07002.

Defendants City of Bayonne and the City of Bayonne Zoning Board of Adjustment share a business address of 630 Avenue C, Bayonne, New Jersey 07002.  Defendant Mark Urban is the current Chairman of the City of Bayonne Zoning Board of Adjustment, and has a business address of 630 Avenue C, Bayonne, New Jersey 07002.  Defendant Clifford J. Adams is the current Vice Chairman of the City of Bayonne Zoning Board of Adjustment, and has a business address of 630 Avenue C, Bayonne, New Jersey 07002.  Defendant Jan Patrick Egan II is the current Secretary of the City of Bayonne Zoning Board of Adjustment, and has a business address of 630 Avenue C, Bayonne, New Jersey 07002.  Defendants Vincent J. LeFante, Louis Lombari, and Frank Pellitteri are the current Commissioners of the City of Bayonne Zoning Board of Adjustment, and have a business address of 630 Avenue C, Bayonne, New Jersey 07002.  Defendants Matt Dorans, Joseph Pineiro, James O'Brien, Jr., and Nicholas DiLullo are the current Alternate Commissioners of the City of Bayonne Zoning Board of Adjustment, and have a business address of 630 Avenue C, Bayonne, New Jersey 07002.

The personal addresses of the parties who are natural persons are not provided at this time in order to protect their privacy.

9665173

Plaintiffs Bayonne Muslims, Abdul Hameed Butt, and Khaled Aly, through their attorneys, make the following allegations against Defendants City of Bayonne, the Bayonne Zoning Board of Adjustment (the "Zoning Board"), and the Zoning Board's Chairman, Vice Chairman, Commissioners, and Alternate Commissioners (the "Individual Defendants"), except as to matters not within Plaintiffs' personal knowledge, which are alleged on information and belief.

## INTRODUCTION

1.      Plaintiffs bring this action to challenge the Defendants' denial of their application to build a mosque in Bayonne, New Jersey.

2.      Plaintiffs applied to the Zoning Board for routine variances, which were needed to convert a decrepit, abandoned, and trash-strewn warehouse on a blighted street into a vibrant community mosque.  Plaintiffs then endured years of bigotry and hate crime from those opposed to the mosque.  Ultimately, the Zoning Board capitulated to the community's anti-Muslim animus and denied the application.  It did so even though it had previously granted indistinguishable variances to Christian churches.  The Zoning Board violated both federal and state law to achieve its desired outcome.

3.      The Zoning Board's denial came after Plaintiffs had invested years of effort to build a mosque to serve the local Muslim community, which had prayed for years in rented space in the dark basement of a local church.  That rented space was unsuitable for Islamic worship and insufficient to accommodate the congregation's activities.  Bayonne's Muslims have no permanent place to pray in a city filled with nearly 40 houses of worship for those of other faiths.

4.      Plaintiffs were conscious from the outset, however, that other Muslim groups in New Jersey attempting to build mosques have faced explosive hostility.  Accordingly, to preempt

1

any issues, they consulted with City officials—specifically, Donna Ward, Bayonne's Zoning Officer; Mark Smith, the City's then outgoing Mayor; and James Davis, the City's then incoming Mayor—about their plans.  They evaluated several potential sites over five years and rejected many at the suggestion of the City officials, who cautioned that the properties were in congested areas of town or did not provide adequate parking.  The site ultimately selected by Bayonne Muslims, 109 East 24th Street (the "Property"), by contrast, has ample on-site parking and is located in a part of the town with sparse traffic and plentiful street parking.  Plaintiffs were assured by Ms. Ward, Mayor Smith, and Mayor Davis prior to purchasing the Property that it was suitable for their intended use, and that Plaintiffs would have no problem obtaining the variances needed to use the existing building as a mosque.  Indeed, the variances needed—relief from setback and buffer requirements—were routinely granted in a congested urban city like Bayonne, especially when existing buildings were being adapted.

5.      The Property lies at the end of a dead-end street.  The building on the Property originally served as a factory and later as a trucking and shipping warehouse for a roofing company.  Most recently, the now-abandoned building was rented by a motorcycle club, which used it for parties.  Another abandoned industrial warehouse bookends the opposite end of the street, and a chemical grouting company is located another half-block away.  The Property faces onto and is adjacent to yet another industrial property that is now being redeveloped.  Beyond the dead-end street lie towering and massive tanks where oil companies stored gasoline in Bayonne for decades.

6.      Bayonne Muslims' plan called for adapting the existing building on the Property. While the interior would be thoroughly renovated, the plans for the exterior of the building were limited to cosmetic improvements, including painting, the removal of barbed wire, replacement

2

of fencing, and installation of new lighting and landscaping. The exterior would otherwise remain unchanged, which meant the surrounding properties would continue to face the same walls at the same distance as had been the case for decades.

7.     As soon as it became known that a mosque was planned for the area, however, local objectors swarmed. One prominent objector, who asserted purported land use concerns at every hearing of the Zoning Board, admitted to the press that he opposed the mosque because "the reality is there are a lot of issues that come with [diversity]," that too many people are coming across the border, and that "the community won't be safe." He proposed that a Catholic Church instead be built at the proposed site.

8.     An objector also posted a petition on Change.org, titled "Stop the Bayonne Mosque/Cultural Center," that drew several hundred signatures. The signatories—often stating that they were local residents—openly addressed their motivations for signing the petition. One illustrative example: "Why should Bayonne bend over backwards for these warmongers."

9.     Michael Alonso, a local politician who has billed himself the leader of the "Real Republicans" in Bayonne, expressed similar bases for opposing the mosque in a television news interview: "It's definitely not the right time, with everything that's happening recently and all over the world. We have ISIS. We have Christians being beheaded. We have the LGBT community being targeted. This is just not the right time. . . . And at the same time, residents don't feel safe."

10.     Objectors also coordinated their efforts online. A Facebook group started by objectors, titled "Stop the Mosque in Bayonne," drew support from several hundred people. Its postings included a picture of a man holding a sign stating "DEMOCRACY OR SHARIA LAW," posts about crimes by individual Muslims, and a photo of the World Trade Center Twin

Towers.  The Facebook group also posted information about relevant Zoning Board meetings and pressured local politicians to oppose the mosque.  Referencing the fact that Bayonne Muslims was then worshipping in the basement of a local church, the Facebook page stated: "Shame on St [*sic*] Henry's Church for allowing this."

11.     The opposition also targeted local businesses owned by Muslims.  It posted flyers and billboards throughout Bayonne encouraging boycotts of Muslim-owned businesses.  These flyers targeted Judicke's Bakery, a local shop owned by Plaintiff Khaled Aly, and Yellow Cab, a local taxi company that he co-owns.  A local publication, *Bayonne Times*, published an ad encouraging the boycott:  "**REMEMBER 9/11** . . .  People once said 'Never Forget,' . . . Yellow Cab & Judicke's bakery have already forgotten.  **Boycott them all**."  (Emphasis in original.)

12.     Even Muslim schoolchildren in Bayonne were not spared.  Flyers placed in school mailboxes read:  "No Mas!  No Mosque!"  ("No Mas" is Spanish for "No More.")

13.     Signs stating "SAVE BAYONNE" and "STOP THE MOSQUE" were also printed and displayed at various places in Bayonne.  Opponents at hearings carried signs that declared:  "IF THE MOSQUE COMES, THE MAYOR GO'S [*sic*]."

14.     Even the church basement rented by Bayonne Muslims for their prayer services was targeted.  A Bayonne resident spray painted the walls with graffiti, including  "FUCK MUSLIMS," "FUCK ALLAH," "FUCK ARABS," and "DONALD TRUMP."   The church eventually refused to continue to rent space to Bayonne Muslims—leaving the congregation with no place to gather or pray.

15.     Bayonne Muslims faced similar religious hostility inside the Zoning Board hearings.  Before one meeting of the Zoning Board, a group of local residents attempted to disrupt a group of Muslim attendees praying quietly in a corner by loudly reciting a Christian

prayer.  At another, Joseph Basile, a local pastor, questioned Bayonne Muslims' representative:
"Do all the leaders in your congregation believe in Sharia law?"  Another objector argued that
the request for variance relief should be denied "because people are going [to become] radical
and they [will] kill people."  And yet another exhorted the Zoning Board that "it is imperative
that [the] beliefs [of Muslims] be more carefully reviewed or examined before being adopted into
[the] community."

16.     Ultimately, the Zoning Board completed its hearings and held a vote.  Bayonne
Muslims had sought three sets of approvals:  (i) a conditional use variance; (ii) a parking bulk
variance; and (iii) certain other minor and uncontroversial bulk variances.  A majority of the
Zoning Board—four out of its seven voting members—voted in favor of the application.  The
conditional use variance required a supermajority of five votes and therefore was denied.  The
parking and other bulk variances, however, only required a simple majority of four votes in
favor, which they received.  The Zoning Board's resolution nonetheless deemed those variances
denied.

17.     The Zoning Board's supposed denial of a parking variance was also egregious for
another reason:  Plaintiffs should never have been forced to apply for a parking variance in the
first place.  Bayonne's Zoning Ordinance states explicitly that a house of worship need provide
only one parking spot for every "4 seats in the main auditorium or their equivalent."  On-site
parking at the Property *exceeded* that standard.  But the Zoning Board nonetheless insisted on far
more parking and required a variance application, which it then denied.  The Zoning Board had
never applied its mosque-specific parking methodology to any Christian churches in Bayonne.
Indeed, many Christian churches in Bayonne provide little or no parking at all.

18.     As to the conditional use variance, the Zoning Board's resolution was based on

5

anti-Muslim community animus.  And it is untenable on its face because the no-voters purported

to base their determination on factors they were legally precluded from considering.  Under

Bayonne's Zoning Ordinance, churches and temples are a conditionally permitted use in

residential zones, which means they are permitted so long as they have at least 20,000 square feet

and satisfy the 30-foot setback and buffer requirements.  Bayonne Muslims sought a variance

from the setback and buffer requirements because the group sought to adapt the existing

structure, which did not provide for any setback and buffer.  Under binding New Jersey Supreme

Court precedent, which the Zoning Board acknowledged in its resolution, the Zoning Board was

required to narrowly limit its consideration to the impact of granting the required variances as to

setbacks and buffers only.  The Zoning Board was not permitted to consider other issues—such

as traffic or the appropriateness of the neighborhood for a mosque—in making that

determination.  The City had already resolved those issues by deeming houses of worship

conditionally permitted uses in the residential zone.  Nonetheless, the no-voting zoning

commissioners stated that they were voting no based on factors that they could not consider.

They even referenced parking—even though the majority voted to grant a parking variance.

19.     The Zoning Board's misplaced focus also meant that it failed to identify any

compelling governmental interest requiring denial of the setback and buffer variances as required

by federal law.  Nor could it.  Nothing was being changed in terms of the structure of the existing

building on the site.  Indeed, the Property was to be used for a less intensive use—a mosque as

opposed to an industrial warehouse or a motorcycle club party venue.

20.     Even if the no-voters had been permitted to consider extraneous factors, however,

their determinations were contrary to the unrebutted testimony of both the applicants' experts

and the Zoning Board's own experts.  All the experts agreed that the mosque would have no

6

appreciable impact on traffic in the area and that parking was plentiful during times of peak usage.  The Chairman of the Zoning Board, however, rejected all of the experts' analyses because he had purportedly "passed the area several times."

21.     The Zoning Board's treatment of Bayonne Muslims' application for a conditional use variance contrasts sharply with how it treated prior applications by Christian churches presenting the same issues.  Under the Zoning Board's own precedents dealing with Christian churches, setback and buffer relief is granted as a matter of course if "the building setback and buffer area are preexisting conditions."  The Zoning Board subjected Bayonne Muslims' application to different and uniquely harsh treatment.  Indeed, the Zoning Board has granted Christian churches the same setback and buffer variances requested by Bayonne Muslims.

22.     The Zoning Board Commissioners voting in favor of the application recognized that the denial was indefensible.  For example, Commissioner Clifford J. Adams noted that "the inability to comply with the condition[al] use standards are all the result of existing conditions" and that the applicants sought only "variances that virtually any new religious institution being established or relocating in the City of Bayonne would require."  He also acknowledged that "any increase in traffic will have a minimal impact on the surrounding area" and agreed that adequate parking was provided.  Zoning Board Secretary Jan Patrick Egan and Commissioners Vincent J. LeFante and Frank Pellitteri similarly voted in favor of the application.  But the minority group of no-voters—Chairman Mark Urban, then-Commissioner Edoardo Ferrante, Jr., and Commissioner Louis Lombari—carried the day, and the mosque's opponents rejoiced.  As the Muslim attendees exited the final Zoning Board meeting, opponents yelled at them:  "go back to where you're from" and "you don't belong here."

23.     Plaintiffs are from Bayonne and they belong in Bayonne.  They bring this action

7

to challenge the Zoning Board's unjust denial and defend the fundamental rights afforded to them by the Constitutions of the United States and the State of New Jersey.

## JURISDICTION AND VENUE

24.     Plaintiffs' federal claims arise under 42 U.S.C. § 2000cc and 42 U.S.C. § 1983. This Court has jurisdiction over this action under 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a).  These state-law claims arise from the same set of facts and circumstances as Plaintiffs' federal claims and are so related to those claims that they form part of the same case or controversy.

25.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to this action occurred in the City of Bayonne, which is located within the District of New Jersey.

## THE PARTIES

### A.     Plaintiff Bayonne Muslims

26.     Bayonne Muslims is a not-for-profit religious congregation organized under the laws of New Jersey.  Bayonne Muslims' mission is to accommodate the spiritual and religious needs of the Muslim community in Bayonne by providing facilities for religious knowledge and education.  Bayonne Muslims endeavors to also provide for the spiritual and social well-being of the local community through recreational activities such as gatherings for the local youth, counseling for families, volunteering for the needy, and participating in interfaith dialogue. Members of Bayonne Muslims are active in the local community.  For example, in recent years, they have spoken at memorial services for victims of the 9/11 terrorist attacks and volunteered for *Meals on Wheels* to provide a Thanksgiving Day lunch to senior citizen homes.

### B.     Plaintiff Abdul Hameed Butt

27.     Plaintiff Abdul Hameed Butt is the President of Bayonne Muslims.  He has been a

8

Bayonne resident since 1989.  After arriving from Pakistan with a Master of Science in Chemistry, Mr. Butt worked for years as a lab technologist and a manager of a convenience store in New Jersey.  He is a father of four sons, all of whom he and his wife raised in Bayonne.  His two eldest sons were the first Muslim children to graduate at the top of their elementary school and high school classes in Bayonne.  All four of his sons have obtained advanced degrees; three have obtained or are in the process of obtaining their PhDs, and one has a Master of Arts.  As a retiree, Mr. Butt devotes much of his time to carrying out the mission of Bayonne Muslims and ensuring that the organization is able to build a religious home in the City.

**C.     Plaintiff Khaled Aly**

28.     Plaintiff Khaled Aly is the Vice President of Bayonne Muslims, and a long-time resident of Bayonne.  After moving to the United States from Egypt in 1979, he began working at Judicke's Bakery in Bayonne as a dishwasher and then a baker.  He purchased the bakery in 2000.  Mr. Aly now owns or co-owns several other businesses in New Jersey and New York City, including Yellow Cab, a taxicab company in Bayonne.  Mr. Aly's businesses employ dozens of individuals.  Mr. Aly's bakery regularly donates baked goods to the Bayonne Fire Canteen and local soup kitchens, including soup kitchens organized by the local Catholic Church.  He has also hosted fundraisers to help victims of fires and accidents in Bayonne.  Mr. Aly met his wife in 1982 when she worked as a counter clerk at Judicke's Bakery.  The couple's two daughters were born in Bayonne where they attended elementary school.

**D.     Defendant City of Bayonne**

29.     Defendant City of Bayonne is a city, chartered under the laws of the State of New Jersey, and located in Hudson County, New Jersey.

**E.     Defendant Zoning Board of Adjustment**

30.     Defendant Zoning Board of Adjustment is comprised of a Chairman, a Vice

9665173

Chairman, a Secretary, three Commissioners, and three Alternate Commissioners.  The Zoning

Board typically has four Commissioners, but one—Edoardo Ferrante, Jr.—recently resigned, and

his replacement has not yet been named.  The Zoning Board's responsibilities include reviewing

applications for construction or signage that do not meet the requirements of Bayonne's Zoning

Ordinance, ruling on applications for variances, and granting variances to allow departure from

land use regulations.

**F.      The Individual Defendants**

31.      Defendant Mark Urban is the Chairman of the Zoning Board.  Defendant Clifford

J. Adams is the Vice Chairman of the Zoning Board.  Defendant Jan Patrick Egan II is the

Secretary of the Zoning Board.  Defendants Vincent J. LeFante, Louis Lombari, and Frank

Pellitteri are Commissioners of the Zoning Board.  Defendants Matt Dorans, Joseph Pineiro,

James O'Brien, Jr., and Nicholas DiLullo are Alternate Commissioners of the Zoning Board.

These Individual Defendants are all sued in their official capacities.

**OVERVIEW OF APPLICABLE LAW**

32.      Plaintiffs bring this action to enforce their rights under the Religious Land Use

and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, the First and Fourteenth

Amendments to the U.S. Constitution, the New Jersey Constitution, and New Jersey state law.

**A.      The Religious Land Use and Institutionalized Persons Act**

33.      RLUIPA was unanimously passed by the U.S. Congress and signed into law on

September 22, 2000.  Congress passed RLUIPA after three years of hearings, which, according

to the congressional record, revealed "massive evidence" of widespread discrimination against

10

religious persons and organizations by state and local officials in land use decisions.[1]  As Congress found, "[t]he motive is not always easily discernible, but the result is a consistent, widespread pattern of political and governmental resistance to a core feature of religious exercise:  the ability to assemble for worship."[2]  Congress found that local zoning ordinances often place the ability of religious groups to assemble for worship "within the complete discretion of land use regulators," who often have "virtually unlimited discretion in granting or denying permits for land use and in other aspects of implementing zoning laws."[3]  RLUIPA's Senate sponsors also observed that houses of worship "cannot function without a physical space adequate to their needs and consistent with their theological requirements."[4]

34.    RLUIPA complements the protections endowed on religious exercise by the First Amendment by prohibiting, in relevant part, three types of conduct in the imposition and implementation of land use regulations.  First, RLUIPA prohibits the implementation of land use regulations in a manner that imposes a substantial burden on the religious exercise of a person or religious institution, in the absence of a compelling state interest achieved by the least restrictive means.[5]  Second, RLUIPA prohibits discrimination on the basis of religion in the imposition or implementation of any land use regulation.[6]  Third, RLUIPA prohibits the imposition or implementation of a land use regulation in a manner that totally excludes or unreasonably limits

---

[1] See H.R. Rep. No. 106-219, 18-24 (1999); 146 Cong. Rec. 16698 (2000) (Joint Statement of Senators Hatch and Kennedy).

[2] H.R. Rep. No. 106-219, at 24; see also 146 Cong. Rec. S7774 (daily ed. July 27, 2000).

[3] H.R. Rep. No. 106-219, at 19-20.

[4] 146 Cong. Rec. S7774.

[5] 42 U.S.C. § 2000cc(a).

[6] Id. at § 2000cc(b)(2).

11

religious assemblies, institutions, or structures within a jurisdiction.[7]  Additionally, pursuant to 42 U.S.C. § 1988(b), prevailing plaintiffs under RLUIPA are eligible for an award of attorneys' fees.

**B.     The First and Fourteenth Amendments to the U.S. Constitution and the New Jersey Constitution**

35.     The First Amendment to the U.S. Constitution, as incorporated through the Fourteenth Amendment, prohibits state and local governments from taking any action that unduly infringes on the free exercise of religion.  The Free Exercise Clause of the First Amendment limits enforcement of laws that impose a substantial burden on the exercise of sincerely held religious beliefs.

36.     The Fourteenth Amendment, directly applicable by its terms to state and local governments, guarantees "the equal protection of the laws" to all individuals.  The Equal Protection Clause of the Fourteenth Amendment strictly limits a state or local government's ability to distinguish individuals or groups on the basis of, among other things, religion.  The Due Process Clause prohibits, among other things, statutes that fail to provide people of ordinary intelligence a reasonable opportunity to understand the conduct governed thereby, as well as statutes that authorize or encourage arbitrary or discriminatory enforcement.

37.     The New Jersey Constitution provides protections that overlap with and complement those guaranteed by the U.S. Constitution.

**C.     The New Jersey Municipal Land Use Law**

38.     Under the New Jersey Municipal Land Use Law (the "MLUL"), a municipal zoning board—here, Defendant Zoning Board—is tasked with reviewing and ruling on

---

[7] *Id*. at § 2000cc(b)(3)(B).

applications for variance relief from the municipality's zoning ordinance.  Bayonne's Zoning

Ordinance, codified in Chapter 35 of Bayonne's Revised General Ordinances, was passed

pursuant to the MLUL.  Under the MLUL, the Zoning Board has the power to grant two types of

variances:   "c" variances," which are sometimes referred to as "bulk variances," and are

governed by N.J. Stat. § 40:55D-70(c); and "d" variances, which are sometimes referred to as

"use variances," and are governed by N.J. Stat. §40:55D-70(d).

39.      The MLUL allows local zoning boards to grant a "c" variance if the applicant

demonstrates that by reason of the shape, topographic conditions, or "an extraordinary and

exceptional situation uniquely affecting a specific piece of property or structure," the strict

application of a zoning regulation "would result in peculiar and exceptional practical difficulties

to, or exceptional and undue hardship upon, the developer . . . ."  N.J. Stat § 40:55D-70(c)(1).

An applicant can also obtain a "c" variance where the purposes of the MLUL "would be

advanced by a deviation from the zoning ordinance requirements and the benefits of the

deviation would substantially outweigh any detriment . . . ."  *Id.* § 40:55D-70(c)(2).  In order to

be approved, a request for a "c" variance must be approved by a simple majority of the zoning

board.  *Id.* § 40:55D-9(a).

40.      The MLUL requires a "d" variance with respect to certain deviations from a

municipal zoning ordinance, including "deviation from a specification or standard . . . pertaining

solely to a conditional use . . . ."  *Id.* § 40:55D-70(d).  New Jersey law requires an applicant

seeking a "d" variance to require proof of both "positive" and "negative" criteria.  Under the

positive criteria, the applicant must establish "special reasons" for the grant of the variance.  *Id.*

The negative criteria require proof that the variance "can be granted without substantial

detriment to the public good" and that it "will not substantially impair the intent and the purpose

13

of the zone plan and zoning ordinance." *Id.*  A variance for conditional use under this provision "shall be granted only by affirmative vote of at least five members . . . ." *Id.*

41.     Under New Jersey law, in evaluating whether to grant a "d" variance related to a conditional use, the zoning board must be mindful that the municipality has determined that the use proposed by the applicant (here, a house of worship) is allowable in the relevant zoning district (here, a residential zone) subject to the satisfaction of conditions set forth in a municipal zoning ordinance (here, a 30-foot setback and buffer).  Accordingly, New Jersey law requires the standard of proof to obtain a variance from conditions imposed on a conditional use to be relevant to the nature of the specific deviation from the ordinance.  In other words, in evaluating whether to grant a variance with respect to specific conditions required by the zoning ordinance, the zoning board cannot base its decision on the general notion that the specific property is not a "good fit" for the neighborhood, which determination has already been made by the zoning ordinance by allowing the use to be conducted in a particular zoning district so long as the applicant satisfies certain specified conditions.

42.     The MLUL forbids decisions by zoning boards that are against the weight of substantial evidence and that are arbitrary, capricious, or unreasonable.

## THE FACTS

**A.     Bayonne Muslims Do Not Have a Facility Where Its Members Can Worship In Compliance With Their Islamic Faith**

43.     Bayonne is a city that has approximately 5.8 square miles.  It has nearly three dozen houses of worship devoted to the Christian and Jewish faiths, but lacks a permanent mosque.



**Legend**

1. Angelic Baptist Church
2. Assumption of the Blessed Virgin Mary Parish
3. Bergen Point Community Church
4. Calvary Episcopal Church
5. Christian Church of Bayonne
6. Defenders of the Christian Faith Church
7. Evangelical Gospel Tabernacle
8. Faith & Victory Church
9. First Assembly of God
10. New Life Church
11. First Filipino Baptist Church
12. Friendship Baptist Church
13. Grace Bible Fellowship
14. Grace Lutheran Church
15. Iglesia Ni Cristo
16. Kingdom Hall Jehovah's Witnesses
17. Our Lady of Mount Carmel Parish
18. Peoples Baptist Church
19. Praise Christian Church
20. Saint Michael Church
21. St. Abanoub and St. Antonious Coptic Orthodox Church
22. St. Henry's Roman Catholic Church
23. St. John the Baptist Catholic
24. St. Mary Star of the Sea Parish
25. St. Nicholas Russian Orthodox
26. St. Peter and Paul Orthodox Church
27. St. Vincent De Paul Church
28. Trinity Episcopal Church
29. Ukrainian Orthodox Church of St. Sophia
30. Virgin Mary and St. John Coptic Orthodox Church
31. Wallace Temple AME Zion Church
32. Rivers of Life Church
33. Congregation Ohav Zedek
34. Temple Beth Am
35. Temple Emanu-El

📍 Mosque proposed by Bayonne Muslims

**Figure 1:  Churches and Temples in Bayonne**

44.     The Islamic faith places substantial value in mosques.  Each mosque is considered to be a house of God where congregants come to share their common faith and to engage in worship.  Muslims are required to pray five times a day, preferably in a mosque.  The Friday afternoon prayer service, referred to as *Jumma*, is the most important service of the week where members of the community congregate to listen to a sermon delivered by an *Imam*, the leader of the Muslim congregation who leads the prayer services and addresses the congregation's spiritual needs.  Muslims also come to the mosque for various other special prayer services, such

15

as evening prayers during the Islamic holy month of *Ramadan*, prayers on Islamic holidays such as the two *Eid* festivals that take place each year, and funeral prayers.  Without a permanent mosque, a Muslim community cannot attract a permanent imam, and it lacks a stable and central location for faith-based education for Muslim children.

45.     A mosque must also be constructed and designed in a manner that allows Muslims to fully experience their faith in a manner consistent with its tenants.  For instance, a mosque is supposed to contain an area that is designed and devoted to *wudu*, a ritual ablution of the face, arms, and feet that Muslims must conduct prior to each prayer.  A *wudu* area must provide ample space, specially designed wash basins, and access to clean water.  Further, a mosque should have a single prayer hall enabling all worshippers to stand and sit in congregation and to see and hear the imam leading the prayer.  Buildings designed for other uses often lack the layout and facilities necessary to operate a mosque consistent with Islamic tenets.

46.     From 2008 until January 31, 2017, Bayonne Muslims rented two rooms in the basement of St. Henry's School, which is associated with the St. Henry Roman Catholic Church, in Bayonne.  Bayonne Muslims used these rooms for prayer services and religious educational programming for Muslim youth.  However, given its odd configuration—one room approximately 24x60 feet and an additional overflow room—the St. Henry facility was crowded and cramped.  It was also dark and not structured to allow the Bayonne Muslims congregation to fully experience their faith.  For instance, congregants needed to be split up in two different rooms for the *Jumma* prayer, impeding their ability to congregate as a group and to see and hear the imam.  The facility also lacked a dedicated area for *wudu*, and congregants were encouraged to perform their ablution at home or work prior to attending a prayer service.

16



**Figure 2:  Bayonne Muslims Entering Basement of the St. Henry's Facility**



**Figure 3:  *Jumma* Prayer in the Basement of the St. Henry's Facility**

47.     One member of the Muslim community described her feelings about being forced to pray in a basement during a Zoning Board hearing:  "When I pray in that basement, I feel like I'm the most horrible person on Earth because my head can't go up to the sky.  I can't be like everyone else because I'm persecuted for being Muslim."

17

48.     Without a permanent home, Bayonne Muslims could not attract a fulltime imam. Nor could Bayonne Muslims fulfill its spiritual mission or provide the additional religious and social services that the organization endeavored to provide to fully realize fundamental tenets of the Islamic faith.

49.     Bayonne Muslims' lease for the St. Henry facility expired on January 31, 2017. Despite the fact that Bayonne Muslims had utilized this facility for nearly nine years without an incident—except for one case of anti-Islam vandalism discussed below—the St. Henry Roman Catholic Church refused to renew the group's lease.  Today, Bayonne Muslims is without a home.  Its congregants are forced to travel to neighboring cities and towns or pursue other avenues to practice their Islamic faith.

**B.     Bayonne Muslims Searched for a Permanent Spiritual Home for Years Before Settling on an Abandoned Factory**

50.     In 2012, given the space limitations and other restrictions in the St. Henry's basement, Bayonne Muslims began searching for a permanent spiritual home of their own.  In doing so, the organization regularly consulted with City officials about its plans.  Bayonne Muslims evaluated several sites.  Because many of the listings were located in high density areas with congested traffic and little parking, City officials recommended that the organization forgo those properties and focus its efforts on less congested areas of the City.

51.     For example, Bayonne Muslims considered purchasing a property at 493-495 Broadway in Bayonne.  But the group was informed by Donna Ward, Bayonne's Zoning Officer, that it would not receive the requisite variances because the property provides for little parking and is located in Bayonne's congested retail area.  Despite the fact that the area is home to many other houses of worship, Bayonne Muslims followed the City's recommendation.

52.     Bayonne Muslims also considered purchasing 80 West 47th Street in Bayonne.

18

But the group was again informed by Ms. Ward that it would not be granted the requisite variances because the location did not provide any off-street parking. Bayonne Muslims again followed the City's recommendation despite the fact that most other houses of worship in the City do not provide any off-street parking whatsoever.

53.     Bayonne Muslims then came across 109 East 24 Street, which is located in a non-congested part of the City with ample parking. Bayonne Muslims was informed by Ms. Ward and Mark Smith, the City's then Mayor, that the Property was suitable for the proposed mosque and that the organization would not have any problems in obtaining the requisite variances to use the building at that site as a mosque. Since Mayor Smith was going to be leaving his office, Bayonne Muslims waited to take any action until the incoming Mayor, James Davis, took office. After Mayor Davis assumed his office, Bayonne Muslims obtained a similar assurance from him. Specifically, Mayor Davis informed Bayonne Muslims that the organization should not have any issues in obtaining the requisite variances because the Property was suitable for the proposed mosque. Bayonne Muslims accordingly signed a contract to purchase the Property in July 2015 for approximately $1 million. The sale was completed that September.

 

**Figures 4 and 5:  The Property (109 East 24 Street, Bayonne, NJ)**

54.     The City apparently remained confident that approvals would be granted throughout the Zoning Board process. Indeed, months before the Zoning Board decision,

9665173

Bayonne Muslims was reassured by Mayor Davis that he did not anticipate any problems with the variance approvals.  At a *Ramadan* dinner in 2016, the Mayor told Bayonne Muslims' representative that the group could begin the process of obtaining construction permits for the Property even before obtaining formal approval from the Zoning Board.

**C.     Bayonne Muslims Announce Plan to Convert the Abandoned Warehouse into a Mosque**

55.     The Property is located in the Constable Hook neighborhood of Bayonne on the dead-end of East 24 Street.  The Property lies approximately two blocks east of railroad tracks that separate this part of the City from the more congested area west of the railroad tracks.  There is ample on-street parking available in the mornings and afternoons within a three-block radius of the Property.  Further, car traffic is exceptionally light in the area.  Indeed, Bayonne Muslims' and the Zoning Board's experts both agreed that, after the mosque is constructed, the Level of Service under the federal guidelines in the area would remain at the highest levels, meaning that the area would continue to have a free flow of traffic allowing motorists to drive at or above the posted speed limit and to have complete mobility between lanes.

56.     Although the area is now zoned for residential use, it contains several lots where industrial activity has been "grandfathered in" because it was being conducted at the lots prior to the enactment of the Zoning Ordinance.  These include the Property itself.  The lots located directly across the street from the Property (south side of East 24 Street) were—at the time of the Property's purchase—also being used for industrial purposes, including by a controlled demolition company and a chemical grouting company.  These lots were recently purchased by a developer that is now in the process of constructing a 181-unit residential complex.  Another industrial property—an abandoned warehouse—is at the other end of 24th Street from the Property.  Directly east of the building, in the dead-end zone, lay several towering tanks that

9665173

were used by oil companies to store gasoline.



**Figure 6:  Overview of the Property's Surroundings**

57.    The Property was developed in 1966, and contains a 23,000-square foot building and parking area that is enclosed with a barbed-wire fence.  The Property has been used for industrial purposes or has been vacant ever since.  It was owned for decades by Bayroff, Max Corp., a manufacturer and distributor of roofing products and sheet metal, as a factory or warehouse.  Most recently, the Property was used by a motorcycle club for, among other things, raucous parties to which the police were called repeatedly.  The Property is currently decrepit.  It is filled with waste and trash—including empty beer and tin cans, plastics, broken machinery, electronic waste and other debris—left there by its prior owners and tenants.

 

 

**Figures 7 to 10:  Current State of the Property**

58.    In August 2015, Bayonne Muslims released a plan to convert the Property into

their mosque and spiritual home.  Bayonne Muslims' plan called for adapting the existing

building on the Property without making any structural changes to the Property's exterior.

Exterior changes were limited to cosmetic improvements, including the removal of barbed wire,

replacement of fencing, and installation of new lighting and landscaping.  Because the exterior

would remain structurally unchanged, the surrounding properties would continue to face the

same walls at the same distance as had been the case for decades, albeit those walls would now

be more aesthetically pleasing and well-maintained.

9665173





**Figures 11 & 12:  Exterior Views of the Property Proposed by Bayonne Muslims**

59.    Bayonne Muslims sought to renovate the interior of the Property to provide for, among other things, a prayer hall where worshipers could pray as a congregation, office space for the imam and volunteers, and an area for *wudu*.

60.    Bayonne Muslims planned to use the Property for all of the activities that they conducted at the St. Henry's facility and those that they could not conduct there due to space or other restrictions.  These activities include prayer service five times a day and *Jumma* prayers, weekend religious instruction for children, religious programming for women, and interfaith dialogue.

61.    Bayonne Muslims' plan called for using the Property for a less intensive use than its prior industrial use, consistent with the neighborhood's zoning plan, which designates the area

for residential use where houses of worship are a permitted use subject to certain conditions. The plan would have enhanced the character of the neighborhood and provided services that the community lacks.

### D.    Bayonne Muslims' Plan is Met with Hostility

62.    The opposition to the mosque was formed immediately after Bayonne Muslims purchased the Property and before the group could even formally announce its plan.  A news article dated July 22, 2015 reported complaints from a prominent objector, "I'm concerned about the whole city being turned upside down and being radicalized.  People want the diversity, but the reality is there are a lot of issues that come with that."[8]  In another article, the same objector cited then-presidential candidate Donald Trump's comments about Mexicans coming across the U.S. border, and stated, "People are coming across the border in Bayonne as well."[9]  The objector also cited terrorist attacks in Europe as a basis for opposing the mosque, stating, "We feel this doesn't belong in our community.  We feel the community won't be safe."[10]  The objector claimed "[t]here's always the thought [of terrorism] in the back of people's minds, and I can't ignore it . . . [i]t's a known fact that a majority of major terrorist attacks are from people who attended a mosque."[11]  The objector suggested that a Catholic church should instead be built on the Property.[12]  The same objector later told the Zoning Board that his opposition to the

---

[8] Joseph Passantino, *Praying for approval:  Muslim group seeking community center meets opposition*, Hudson Reporter, July 22, 2015.

[9] Jonathan Lin, *Bayonne Muslim group aims to open mosque; residents have mixed reactions*, The Jersey Journal, Aug. 21, 2015.

[10] Joseph Passantino, *Neighbors say, not in our backyard:  Anti-Muslim sentiments fuels protest against community center*, Hudson Reporter, Jan. 13, 2016.

[11] Talal Ansari, *These Muslims Are Praying In A Basement While Fighting To Get Their Mosque Built*, BuzzFeed News, June 30, 2016.

[12] Jonathan Lin, *Bayonne residents opposed to Islamic center to protest at City Hall*, the Jersey Journal, Jan. 14, 2016.

proposed mosque was based on land use issues, not his views about Islam or Muslims.

63.     Opponents of the mosque also mobilized on the Internet.  They started a petition on Change.org, titled "Fighting for an Improved Bayonne."  According to the petition, it received over 460 signatures and was delivered to the Bayonne City Council.  The petition ostensibly claims that it opposes the proposed mosque because of the "difficult parking situation," but the true motivations of some of its signatories are apparent from the comments they made under the section of the petition titled "Reasons for Signing."  Below are the reasons provided:

- "These people do not want peace.  Look up your history they have been at war with Christianity and Judaism since the 6th century.  Why should bayonne bend over backwards for these warmongers."

- "This is a damned disgrace!  You gotta stop this mosque before we have homegrown terrorists right here in our backyard."

- "They gave our community the first bombing if [*sic*] the WTC in 1993.  Religion of peace? Wake up!"

- "We're being run out of our homes by these people who have nothing in common with us as a whole.  The American people.  I think with all the tension surrounding the Islamic culture we have every right to be concerned about the happenings being proposed for this center."

- "We are at war with Islam.  I refuse to coexist with savages who murder human beings . . . .  Every mosque on [*sic*] this country should have burned down 14 years ago.  When will the final straw break the camel fucker's back?  Are you going to tolerate our worst enemy until we are subjugated and all our women are wearing trash bags? . . . .

64.     The mosque's opponents included local politicians.  In an interview aired on *ABC News*, Michael Alonso, candidate for State Assembly and the local school board as well as the purported leader of the "Real Republicans" group in Bayonne, claimed that he opposes the mosque because "[i]t's definitely not the right time, with everything that's happening recently and all over the world.  We have ISIS.  We have Christians being beheaded.  We have the LGBT community being targeted.  This is just not the right time. . . .  And at the same time, residents don't feel safe."

65.     The mosque's opponents were also active on the social media website Facebook

25

where they created a group page titled "Stop the Mosque in Bayonne," which has over 300 followers.  The group posted a picture of a man holding a sign stating "ZONING LAWS MATTER!" in an apparent pejorative reference to the Black Lives Matter movement.  The group also openly states that it "take[s] a stance against the rise of mosques which are advancing this second society within our own."  According to the group, "[m]ost importantly, we take a stance against the usurpation of our WESTERN way of life due to the demanding concessions our governments keep agreeing to in the name of Islam."  The group prominently features an alleged quote from Winston Churchill:  "The religion of Islam above all others was founded upon the sword.  Moreover, it provides incentives to slaughter, and in three continents has produced fighting breeds of men filled with a wild and merciless fanaticism."  The group's postings include a picture of a man holding a sign stating "DEMOCRACY OR SHARIA LAW," posts about alleged acts of terrorism or crimes by individual Muslims, and a photo of the World Trade Center Twin Towers on which a commenter posted "no in bayonne go to other place [*sic*]."  The group also posted information about meetings of the Zoning Board regarding Bayonne Muslims' application, and posts about recalling the City's Mayor and a councilman who stood accused of supporting the mosque.  Referencing the fact that Bayonne Muslims was then worshipping in the basement of a local church, the Facebook page states:  "Shame on St [*sic*] Henry's Church for allowing this."

26



**Figure 13:  Picture Posted on Facebook Group "Stop the Mosque in Bayonne"**

66.    Similar views were expressed on a separate private Facebook page titled "Neighbors United Against Building the Mosque," which has more than 600 members.  News reports quoted one member of the group writing, "[c]hurches are being closed and mosques are being built.  There's a lot of infiltration going on around the world.  It's a known fact a lot of these mosques are funded by oil money and terrorists.  I'm concerned about safety and the quality of life here in Bayonne."

67.    The objectors also took to the Internet to raise funds to support the opposition to the mosque.  Mr. Alonso started a page on GoFundMe.com titled "Stop the Mosque in Bayonne."  The website states:  "Help STOP the MOSQUE.  Located within 6 miles of ground Zero, a proposed mosque needs to be stopped. . . .  The radical Islamic community has gathered money from all over the world and this must be stopped. . . .  Don't let the biggest Mosque be built in Hudson County.  3 Miles from NYC – Never Forget."

68.    The opposition also openly encouraged boycott of Muslim-owned businesses in Bayonne.  These efforts targeted two local businesses in particular:  Judicke's Bakery, the business that Plaintiff Khaled Aly purchased after having first worked there as a dishwasher, and Yellow Cab, a local taxi company that he co-owns.  The opposition encouraged a boycott by

publishing an ad in the *Bayonne Times* stating, "**REMEMBER 9/11** . . . People once said 'Never

Forget,' . . . Yellow Cab & Judicke's bakery have already forgotten.  **Boycott them all**."

(Emphasis in original.)  The opposition also posted billboards throughout the City, stating

"BOYCOTT . . . YELLOW CAB . . . JUDICKE'S."  And objectors handed out flyers to local

businesses and residents encouraging boycott of Judicke's Bakery and Yellowcab.



**Figure 14:  *Bayonne Times* Ad Encouraging Boycott of Yellow Cab and Judicke's Bakery**



**Figure 15:  Billboard Encouraging Boycott of Yellow Cab and Judicke's Bakery**

69.     The opposition even targeted Muslim schoolchildren in Bayonne.  A teacher at the Bayonne High School told *Press TV* that students at the high school were targeted with flyers in school mailboxes stating "No Mas!  No Mosque!"

29



**Figure 16: "No Más! No Mosque" Flyer**

70.     The opposition also circulated numerous other flyers throughout Bayonne that

sought to spread misinformation about Bayonne Muslims.  For instance, a flyer titled

"EMERGENCY MEETING STOP THE MOSQUE" listed several "facts" that were false.  The

flyer claimed that "[t]housands of Muslims will be descending onto the Eastside 5 Times a day, 7

Days a week, 24/7, Creating Massive Gridlock and parking problems."  (Bayonne Muslims'

services have never attracted "thousands" of worshipers at the same time, nor have any of their

programs caused any gridlock or parking problems.)  The flyer claimed that the soil at the

Property "has NOT been proven safe from dangerous contamination."  (An environmental

assessment of the Property confirmed that there are no conditions present that need to be

evaluated for any potential environmental risks.)  And the flyer claimed that the Property would

"cause more FLOODING Because the proposed Mosque Property is in a designated FEMA FLOOD ZONE."  (The Property is not located in a FEMA flood zone.)  Another flyer titled "STOP THE MOSQUE" falsely claimed that Bayonne Muslims has ties to the Muslim Brotherhood.  (There are no such ties.)

71.    The basement of St. Henry's school that was utilized by Bayonne Muslims for prayer services was also targeted by a mosque opponent.   It was vandalized by a 20-year-old Bayonne resident who spray painted the walls and windows with graffiti, including "FUCK MUSLIMS," "FUCK ALLAH," "FUCK ARABS!" and "DONALD TRUMP."  The vandal was identified and eventually pled guilty to criminal mischief, bias intimidation, and criminal trespass.  He was sentenced to probation.



**Figure 17:  Graffiti at the St. Henry's Facility**

**E.    The Objectors Refuse Meetings with Bayonne Muslims to Address Any Legitimate Land Use Concerns**

72.    Seeking to defuse local opposition and promote understanding, Bayonne Muslims held two open houses to discuss their plans.  The first was held at the Trinity Episcopal Church in Bayonne on June 5, 2016.  The second was held at St. Henry's School on October 24, 2016.  Both meetings were advertised on social media and a local online newspaper.  Additionally,

31

Bayonne Muslims sent letters to the neighbors in the area of the Property inviting them to the first meeting, and placed an ad in a local print newspaper publicizing the second meeting.  Most of the vocal objectors, however, refused to attend either meeting.

73.     Bayonne Muslims also took other steps to try and address local opposition.  They even agreed to meet with the objectors at the bar owned by one of the lead objectors where the opposition regularly met.  The objectors initially agreed to that meeting, but then cancelled it and refused to meet.  Plaintiff Khaled Aly also invited one of the vocal objectors whose backyard faces the rear wall of the proposed mosque to his house so that he could address her concerns, but she declined the invitation.

## F.     Bayonne Muslims Face Animus and Hostility During Zoning Board Hearings

74.     Bayonne Muslims submitted its application for variance relief to the Zoning Board in August 2015.  The Zoning Board held three hearings on the application:  January 19, 2016; January 23, 2017; and March 6, 2017.

75.     Each of the hearings was attended by crowds of opponents to the mosque who expressed hostility directly to local Muslims.  For example, at the March 6, 2017 hearing where the Zoning Board denied Bayonne Muslims' application, a local policeman stationed at the hearing site told a representative of Bayonne Muslims to "go back to where you're from."  Another objector to the mosque shouted "you don't belong here."  Objectors also lined up outside the hearings and at demonstrations with signs stating their opposition to the mosque.



**Figure 18:  Signs Held by Mosque Opponents**[13]

76.     Inside the Zoning Board hearings, objectors questioned witnesses about and

offered their opinions on matters having no relevance to land use or the variances being sought.

For example:

- Joseph Basile, a local pastor, questioned Bayonne Muslims' representative about Sharia law, inquiring "[d]o all the leaders in your congregation believe in Sharia law? . . . Would you be willing to see Sharia law be imposed on the people of your congregation."

- An objector asked Bayonne Muslims' witness whether "the community center [has] reached out to the Bayonne police department in anticipation of possibly needing extra police officers on a Friday night?"

- An objector asked Bayonne Muslims' witness whether the objector would be allowed "[t]o come to the mosque to pray to Jesus Christ."

---

[13] Image sourced from *The Star Ledger*.  *See* http://www.nj.com/hudson/index.ssf/2016/01/bayonne_residents_against_planned_islamic_center_t.html

33

- An objector claimed that the mosque should not be approved because his Christian relatives in Egypt have been victims of hate crimes by Muslims: "if you approve on this, you don't know what's going to happen inside, what's preached. In Egypt right now, they are struggling with the preaching inside the mosques, in Egypt. Because people are going radicals [*sic*] and they kill people. . . . [M]y uncle got slaughtered in the middle of the road January 3rd, because he's Christian. And I got my cousin, he's handicapped, right now, he have two kids. He got shot by a Muslim brotherhood because he's Christian."

- An objector implored the Zoning Board to evaluate Muslims' beliefs carefully because, according to her, the Koran (the Muslim holy book) contains passages directing Muslims to kill: "If those beliefs pose any direct threat to any people or community, those beliefs must first be questioned and carefully examined and considered, particularly if the text or teachings of said religions clearly instruct any one person to harm, injure, or kill another human life in any name. I would now like to quote from . . . the Koran. . . . .'"

 

**Figures 19 and 20:  Objectors Questioning Bayonne Muslims' Witnesses at Heavily Attended Meetings of the Zoning Board**[14]

77.       Some residents of Bayonne courageously called out the religious bigotry that they witnessed in the Zoning Board process.  A young Muslim testified about the divisiveness that he experienced at the Zoning Board hearings:

> [I]'m a Bayonne kid.  I wasn't born here, I came here in the third grade.  And this town gave me an opportunity. . . .  I was blessed because of the education I got here.  I was fortunate, I got a job . . . .  You want to know the first thing I did, . . . I bought a house in Bayonne, in the town that I love. . . .  I never felt this divisiveness. This wasn't part of how I grew up.  No one thought of me as a Muslim kid or an Egyptian kid.  I was just Ali, you know.  I was captain of the swim team for Bayonne High School, I won a

---

[14] Images sourced from *Hudson County View* television news report.

34

county championship.  I probably swam with some of your kids, they're my friends.  We grew up here together.  And we're not here to infringe your property rights or hurt your feelings or, you know, be scared or scare you.  We're here to be your friends, open yourself up to the opportunity and watch what kind of friendship we can develop with you.

78.    A non-Muslim resident of the City, also stood to speak before the Zoning Board with her baby on her shoulder.  She spoke plainly about the bigotry she observed at the hearings: "we've heard a lot tonight [from objectors] that this isn't a religious issue.  I would love to take that on the face of it and believe it, but I actually think that a huge part of this contingent showed their true colors before the meeting even began."  She pointed out that the objectors began reciting the Lord's Prayer when they observed some Muslims quietly praying in a corner.  She noted, "they did that, I believe, in my humble opinion as a direct and very disrespectful assault on people who weren't bothering them at all."  And she concluded:  "[Bayonne Muslims] planned well, they've accommodated all of the concerns necessary.  And they are entitled to the same religious freedom and the right to assembly that every other taxpaying, law abiding citizen here is entitled to."

## G.    The Zoning Board Denies Bayonne Muslims' Request for Variance Relief

79.    The Zoning Board voted on Bayonne Muslims' application for variance relief at the March 6, 2017 hearing.  The final site plan application submitted by Bayonne Muslims sought (i) a request for variance relief with respect to the 30-foot setback and buffer requirements that Bayonne Muslims needed to satisfy to obtain a conditional use variance, (ii) a request for variance relief with respect to parking, and (iii) a request for variance relief with respect to certain minor curb cut and parking setback requirements.  The Zoning Board voted 4-3 in favor of Bayonne Muslims' application, but nonetheless denied each of the requested reliefs.

The Zoning Board issued a written resolution denying relief on April 17, 2017.[15]

        ***1.     Denial of Conditional Use Variance***

                *a.     The Zoning Ordinance's Requirement*

80.      Under Bayonne's Zoning Ordinance, houses of worship are a conditional use in residential zones if the applicant satisfies three criteria:  (i) 20,000 square feet in the area; (ii) a 30-foot setback from the property line; and (iii) a 30-foot buffer from each adjacent property consisting of plantings at least 5 feet.[16]  The Property satisfied the first criteria, but did not provide the required setback and buffer.  Accordingly, Bayonne Muslims sought a variance with respect to these requirements.  A variance with respect to a conditional use requirement is considered a "d" variance, which requires at least five votes for approval.[17]

                *b.     The Evidence Considered by the Zoning Board*

81.      Bayonne Muslims provided the Zoning Board with substantial evidence as to why the conditional use variance with respect to setback and buffer should be granted.  For instance, John McDonough, Bayonne Muslims' planning expert, testified that the variance should be granted because, among other things, the existing building does not currently provide any buffer and setback and it is being converted from a high intensity use—where buffer and setbacks are more important—to a less intensive use that is "much cleaner, neater . . . ."  Further, the neighbors would see no change from the walls they had been looking at for decades, other than cosmetic improvements.  In rendering its decision, the Zoning Board did not rely upon or cite any evidence or testimony related to the setback and buffer issue that was contrary to that offered by Bayonne Muslims.

---

[15] The Zoning Board's resolution denying relief is attached hereto as Exhibit A.

[16] Zoning Ordinance §§ 35-5.3(d)(2), 35-5.28(1).

[17] N.J. Stat. § 40:55D-70(d).

c.    *The Zoning Board's Decision*

82.    The Zoning Board refused to grant the conditional use variance requested by

Bayonne Muslims.  The Zoning Board voted 4-3 in favor of the variance, which fell one vote

short of the five-vote requirement.  The three members of the Zoning Board who voted against

the requested relief articulated the following reasons for their votes:

- Chairman Mark Urban:  "If the number of people that want to come to their center that
  night exceeds the maximum occupancy, I don't see them turning anybody away. . . .
  [T]hat brings with it added traffic, added pedestrian traffic.  And there is just definitely
  not enough parking in the area to handle all of what this applicant wants to bring. . . .  [I]
  passed the area several times and I have to differ with the traffic survey.  I didn't see no
  hundred spots.  Parking is going to be an extreme issue there."

- Then-Commissioner Edoardo Ferrante, Jr.:  "Very, very, very quaint, residential area is
  on the east side.  The question is can it fit at this spot. And it is my opinion that it
  cannot.  It cannot fit.  This is just a bad spot. . . .  This little dead end street is not suited
  for such a big, high density use."

- Commissioner Louis Lombari:  "The approval of this community center, I do believe
  would be negative impact to this neighborhood, being that it is a dead end street.  And
  whatever increase of traffic there may be it is already too much."

83.    The Zoning Board's decision was based on a capitulation to community animus.

It is demonstrably illegal and discriminatory.  For example, the Zoning Board's discretion in

evaluating whether to grant a conditional use variance is limited to assessing "special reasons"

offered and the "negative criteria" associated with the setback and buffer requirements

specifically (*see* paragraph 40, *supra*).  But the Zoning Board denied the variance based on

factors having no relevance to the setback and buffer requirements.  Specifically, the Zoning

Board cited traffic and parking in the area and the appropriateness of a mosque in the

neighborhood.  In doing so, the Zoning Board ignored the fact that the Zoning Ordinance has

already decreed that the proposed mosque is appropriate for R-2 zoning districts, where the

Property is located.  The Zoning Board is not authorized to countermand that determination.

84.    Further, the Zoning Board's purported concerns with regard to traffic were

9665173

contradicted by the unrebutted testimony of both Bayonne Muslims' planning and traffic experts and the Zoning Board's own expert.  The Zoning Board's expert agreed with Bayonne Muslims' expert's conclusion that the area surrounding the Property would not suffer from any traffic delays stemming from the proposed mosque because it has ample reserve capacity to handle any increase in traffic flowing to and from the Property.  As discussed below, the Zoning Board's purported concerns as to parking were equally invalid and, in any event, a majority vote granted a parking variance if one were needed at all.

85.    The discriminatory nature of the Zoning Board's decision is further demonstrated by the fact that the Zoning Board has routinely issued conditional use variances to houses of worship of other faiths that did not satisfy the setback and buffer requirements in comparable circumstances.

86.    For example, in 2012, the Zoning Board granted a setback and buffer variance to the Iglesia Ni Cristo, which—similar to Bayonne Muslims—sought to convert an existing commercial building into a house of worship without making any changes to the structure.  In evaluating the variance request, the Zoning Board noted that the applicant's architect had testified "that with regard to the buffer requirements . . . nothing further could be done to address these variance issues."  The Zoning Board ruled that "the applicant has satisfied the criteria for conditional use variance as set forth in *Coventry Square vs. Westwood Zoning Board of Adjustment*, 138 NJ 285 (1994), in that the building setback and buffer area are preexisting conditions which have no affect [*sic*] on the proposed project.  The variance cannot be cured because it is an existing structure."  The Zoning Board found that granting the variance sought by the Iglesia Ni Cristo "will not have a substantial negative impact on the public good nor would it substantially impair the intent and purpose of the Zoning Ordinance."  According to the

38

Zoning Board, granting the variance "would advance the purposes of land use law and ordinance by improving safety and quality in the neighborhood." Further, "[t]he granting of the conditional use variance . . . is consistent with the City of Bayonne economic plan to transition from an industrial based economy to a service sector economy with an emphasis on revitalization." Moreover, according to the Zoning Board, "[t]he proposal is consistent with the State plan to revitalize deteriorating areas, conserve natural resources and promote economic growth for all citizens in the Hudson County strategic revitalization plan . . . ."[18]

87.     By granting a setback and buffer variance to the Iglesia Ni Cristo but denying such variance relief to Bayonne Muslims, the Zoning Board treated Bayonne Muslims differently and less favorably than it treated Iglesia Ni Cristo.

88.     In 2011, the Zoning Board also granted a variance to the Virgin Mary and St. John Coptic Orthodox Church in connection with an application to expand its existing structure to include a 15,000-square foot addition adjacent to the existing building. The Zoning Board observed that the applicant did not satisfy any of the three requirements for a conditional use variance:  a lot of at least 20,000 square feet, setbacks of 30 feet from any property line, and a 30-foot landscape buffer strip along each adjacent property line with plantings of at least 5 feet. The Zoning Board noted that the applicant's architect testified that "there was not a standard size Church that could be built in the City of Bayonne at the present time in the residential zone because of the setback requirements" and that "the setbacks would make this facility impossible to develop." Further, the architect informed the Zoning Board "that with regard to buffer requirements, there is nothing that could be done to address the variance issues at the property."

---

[18] The Zoning Board's resolution granting variance relief to Iglesia Ni Cristo, along with a later resolution providing added information about this 2012 application, is attached hereto as Exhibit B.

The Zoning Board granted the Virgin Mary and St. John Coptic Orthodox Church's request for a conditional use variance. It found "that the application for this Church is an inherently beneficial use and that the applicant has made its best efforts to alleviate the issues with regard to this application." According to the Zoning Board, the application "satisfie[d] the special reasons because this use would promote the public health, welfare and safety, morals and general welfare as set forth in the MLUL. It promotes a desirable visual environment. There is an identifiable need for this use at this site making it particularly suitable which results in an efficient use of land . . . ." Further, the Zoning Board found "that the applicant has satisfied the criteria for a conditional use variance set forth in *Coventry Square vs Westwood Zoning Board of Adjustment*, 138 NJ 285 (1994) in that the building setback and buffer areas are designed to bring the application as close to compliance as the site allows the applicant."[19]

89.     By granting a setback and buffer variance to the Virgin Mary and St. John Coptic Orthodox Church but denying such variance relief to Bayonne Muslims, the Zoning Board treated Bayonne Muslims differently and less favorably than it treated the Virgin Mary and St. John Coptic Orthodox Church.

90.     Similar to the Iglesia Ni Cristo and Virgin Mary and St. John Coptic Orthodox Church, the setback and buffer areas with respect to the Property are preexisting conditions that have no bearing on the proposed project. Further, Bayonne Muslims' plan also sought to improve the fabric of the neighborhood without negatively affecting the neighboring properties. Indeed, Bayonne Muslims planned to use the Property for a less intensive use (a mosque) as opposed to highly intensive uses being conducted there before (e.g., industrial factory,

---

[19] The Zoning Board's resolution granting variance relief to the Virgin Mary and St. John Coptic Orthodox Church is attached hereto as Exhibit C.

motorcycle club party venue).  Yet, the Zoning Board failed to give Bayonne Muslims the treatment and benefit that it had afforded to Christian churches.

91.    Commissioner Adams, who voted in favor of Bayonne Muslims' application, took an approach consistent with the Zoning Board's treatment of prior Christian church applications.  Commissioner Adams noted that "[t]he inability to comply with the condition[al] use standards are all the result of existing conditions that cannot be easily remediated.  These require variances that virtually any new religious institution being established or relocating in the City of Bayonne would require."

92.    Further, contrary to RLUIPA, the Zoning Board's decision imposed a substantial burden on Bayonne Muslims' right to practice their religion.  In doing so, the Zoning Board did not—nor could it—identify any compelling governmental interest with respect to the setback and buffer requirements.  Indeed, the Zoning Board's resolution and the comments made by the no-voting commissioners are devoid of any reason justifying denial of the variance related to the setback and buffer requirements.  The supposed interests identified by the Zoning Board no-voters are irrelevant and do not constitute compelling governmental interests.  The Zoning Board also did not achieve any governmental interest it has in these requirements by the least restrictive means, as required by RLUIPA.

93.    The Zoning Board's violation of RLUIPA is not unsurprising given that its chair candidly admitted on the record during a hearing on Bayonne Muslims' application that the board had no knowledge of a December 2016 letter sent by the United States Principal Deputy Assistant Attorney General for the Civil Rights Division to States, counties, and municipalities regarding the importance of compliance with RLUIPA.

### 2. *Denial of Parking Variance*

#### a. *The Zoning Ordinance's Requirement*

94.     Bayonne's Zoning Ordinance sets forth a parking space requirement for each particular use.  For a "church and temple," the ordinance requires 1 parking space for every "4 seats in the main auditorium or their equivalent."  Zoning Ordinance § 35-17.6(b)(2).  Even though this provision uses the phrase "church or temple," it applies equally to other houses of worship such as mosques pursuant to the Zoning Ordinance's definitions clause.  Defendants agree that the clause applies to mosques.  For mosques, the ordinance requires 1 parking space for every 4 prayer mats in the mosque's prayer hall.

95.     The Zoning Ordinance does not require any house of worship to provide additional parking spaces for rooms other than the auditorium or its equivalent located in the house of worship.  For instance, although churches typically contain office space that is utilized by priests, the Zoning Ordinance does not require any additional parking spaces for such an area.  This is only logical given that at the time a major prayer service is conducted in a church's auditorium, the priest likely will not be using the office space and will instead be either participating in or leading the prayer service.

#### b. *The Evidence Considered by the Zoning Board*

96.     In its initial application, filed in August 2015, Bayonne Muslims specified that the group was contemplating 216 prayer mats in the prayer hall.  Under the 1:4 ratio set forth in the Zoning Ordinance, Bayonne Muslims was required to provide 54 off-street parking spaces.  Bayonne Muslims' site plan application provided for 37 off-street parking spaces.[20]  Bayonne Muslims thus sought a variance from the parking ratio set forth in the Zoning Ordinance.

---

[20] Bayonne Muslims' expert initially calculated the number of parking spaces available at the Property to be 36, but that number was later revised to be 37.

97.     Bayonne Muslims believed—based on the Zoning Board's track record with respect to similar applications by other houses of worship and representations made to Bayonne Muslims by Ms. Ward, Mayor Smith, and Mayor Davis—that the Zoning Board would grant a variance with respect to the 1:4 ratio.

98.     Moreover, with 37 off-street parking spaces, the proposed mosque provided on-site parking that equaled or exceeded that provided by all but one other house of worship in Bayonne.

99.     Further, the ample on-street parking available during peak hours that the mosque would be used—Friday afternoons during the *Jumma* service—far surpassed on-street parking available in parts of the City where many other houses of worship are located.

100.    Bayonne Muslims' application for a parking variance was supported by expert testimony.  On September 30, 2015, Bayonne Muslims submitted a traffic impact study by an expert retained by the group that described the traffic and parking patterns in the area surrounding the Property.  The study found over 50 on-street parking spaces within an approximately one-block radius of the Property during Friday afternoons.  The study concluded that the substantial on-street parking in the area would more than account for the shortfall in of-street parking required by the Zoning Ordinance.

101.    Nonetheless, Bayonne Muslims' request for variance relief received uniquely harsh treatment from the Zoning Board.  The Zoning Board hired its own expert to evaluate the study submitted by Bayonne Muslims.  The Zoning Board had never previously hired its own expert to evaluate traffic impact or parking studies submitted by applicants seeking variance relief, including by Christian churches that have provided substantially less off-street parking than that provided by Bayonne Muslims and that are located in heavily congested parts of the

City.

102.    For over a year, the Zoning Board's expert advanced contrived and novel positions with respect to the study submitted by Bayonne Muslims' expert.  Bayonne Muslims' expert responded to each of the critiques by the Zoning Board's expert, only to be met again with additional contrived concerns.  Bayonne Muslims was forced to incur substantial costs to address these issues, which included paying the fees incurred by the Zoning Board's expert in evaluating Bayonne Muslims' expert submissions.

103.    On November 28, 2016, Bayonne Muslims' expert submitted a revised study that addressed the concerns raised by the Zoning Board's expert.  The report stated that to lessen the effect of parking in the area, Bayonne Muslims had agreed, among other things, to (i) limit the number of prayer mats in the prayer hall at the Property to 135 as opposed to 216 as originally proposed, (ii) not use the other rooms at the Property simultaneously during the use of the prayer hall, (iii) not conduct any activities within the Property during the time of prayer services, (iv) conduct two *Jumma* services on Friday as opposed to one as initially proposed, (v) add a third *Jumma* service should future attendance increase, and (vi) not hold the prayers associated with the two *Eid* festivals at the mosque.  Bayonne Muslims also separately represented to the Zoning Board and its expert that it was willing to arrange for valet parking service at the Property, which would allow for more cars to be parked in the Property's parking lot, and to arrange for a shuttle van to transport congregants who could not find parking at the Property to and from a nearby municipal parking lot.

104.    Bayonne Muslims' expert's November 28, 2016 report also stated that the organization met the spirit and intent of the parking requirements set forth in the Zoning Ordinance.  As set forth in the report, Bayonne Muslims will be providing 3 more parking spaces

than required by the Zoning Ordinance—37 parking spaces for 135 prayer mats in the prayer

hall—and the organization is agreeing not to use any other rooms in the Property at the time the

prayer hall is utilized.  The report also stated that a more recent survey of a 4-block radius of the

Property that was conducted on a Friday afternoon found over 100 vacant parking spaces, which

would easily suffice to absorb any increase in parking demand that is not already met by the

parking provided at the Property.

105.     In a January 18, 2017 memorandum provided to the Zoning Board, the Zoning

Board's expert agreed with the key conclusions set forth in the November 28, 2016 report

submitted by Bayonne Muslims' expert.  The Zoning Board's expert acknowledged that "the two

Friday prayer service structure is intended to decrease the . . . parking impacts associated with

the services by spreading out the Friday prayer event over a longer period while offering prayer

service attendees the option of which service they would like to attend."  The Zoning Board's

expert also noted with approval Bayonne Muslims' expert's finding that "over 100 parking

spaces [can be found] within a convenient walking distance from the site."  At the January 23,

2017 hearing, the Zoning Board's expert confirmed that he "can concur with the majority of the

testimony that that [Bayonne Muslims' expert] has offered."

106.     However, despite Bayonne Muslims' agreement not to utilize any other area in

the proposed mosque at the time prayer service was being held in the prayer hall, the Zoning

Board's expert contended that a variance as to parking was required because the proposed

mosque also had other areas such as office space, which, under the Zoning Ordinance, requires 1

parking space per 400 square feet.  The Zoning Board's expert aggregated the number of parking

spaces required for each of the other areas under the Zoning Ordinance.  The expert concluded

that the proposed mosque required 62 parking spaces, as opposed to 34 calculated by Bayonne

Muslims' expert.

      *c.*     *The Zoning Board's Decision*

      (i)     The Zoning Board's Calculation of Parking Spaces Required

107.    The Zoning Board adopted its expert's calculations and ruled that Bayonne Muslims must provide 62 parking spaces accounting for **all** rooms and spaces in the Property, despite the plain text of the Zoning Ordinance and even though none of the rooms and spaces will ever be simultaneously utilized. As such, even though Bayonne Muslims provided 37 parking spaces for 135 prayer mats in the prayer hall, which more than satisfies the 1:4 parking ratio set forth in the Zoning Ordinance, the Zoning Board found that Bayonne Muslims required a variance as to parking.

108.    The Zoning Board's calculation of the number of parking spaces required under the Zoning Ordinance has no basis in its text. The Zoning Ordinance is clear that houses of worship must provide 1 parking space for every four seats (or prayer mats in the case of a mosque) in the main auditorium or its equivalent. It contains no requirement that houses of worship must also provide parking spaces for other rooms. Further, such a requirement would be inappropriate particularly where the applicant has agreed to not utilize the other rooms when the auditorium or its equivalent (here, the prayer hall) is in use.

109.    The Zoning Board has never previously utilized this methodology—the aggregation of parking spaces required with respect to each room in a house of worship—to calculate parking needed by any other house of worship.

110.    Rather, for other houses of worship, the Zoning Board departed downwards from the 1:4 parking ratio in calculating the number of parking spaces required under the Ordinance before even considering variance relief. For example, with respect to the August 2011 application by the Virgin Mary and St. John Coptic Church to construct an addition to the

46

church, the Zoning Board observed that the new addition would have "a new sanctuary with 281 seats on the first floor, offices and classrooms on the second floor, a children's multi-purpose room on the third floor and a fellowship hall in the basement." According to the Zoning board, "[t]he proposed building also includes a lobby [and] library . . . ." Yet, the Zoning Board found that the applicant must provide only 58 parking spaces under the Zoning Ordinance, which is *13 fewer* than the parking spaces required under the 1:4 ratio if it is applied only to the 281-seat sanctuary on the first floor. The Zoning Board did not require the applicant to provide any additional parking spaces for the numerous other spaces and areas in the new addition, e.g., classrooms, multipurpose room, fellowship hall, lobby, library. Moreover, as detailed below, the Zoning Board then allowed variance relief below the 58-space requirement.

111.    Similarly, with respect to a 2012 application by Iglesia Ni Cristo to convert an existing commercial facility into a church, the Zoning Board noted that the church's congregation consists of 290 members. Despite the fact that under the 1:4 ratio, the church would have been required to provide 73 parking spaces, the Zoning Board found that the church required 53 parking spaces. Again, as detailed below, the Zoning Board then allowed variance relief below the 53-space requirement.

112.    The Zoning Board treated Bayonne Muslims differently from Iglesia Ni Cristo and the Virgin Mary and St. John Coptic Orthodox Church because it utilized a calculation methodology with respect to Bayonne Muslims' application that was less favorable than the methodology utilized in connection with applications by Iglesia Ni Cristo and the Virgin Mary and St. John Coptic Orthodox Church.

(ii)    The Zoning Board's "Denial" of a Parking Variance

113.    To the extent a variance as to parking was required, the Zoning Board's decision to deny such relief does not comply with New Jersey and federal law. Under New Jersey law, a

47

variance as to parking is considered a "c" variance, which requires approval by a majority of the Zoning Board.[21]  The Zoning Board's final resolution purported to deny the variance request despite the fact that 4 out of 7 commissioners voted in favor of the application.  This denial is irreconcilable with the recorded vote.

114.    The Zoning Board also had no evidentiary basis to deny the requested relief. Bayonne Muslims demonstrated that the Property is affected by an extraordinary and exceptional situation in that the parking area is a preexisting condition and there is ample parking—more than 100 parking spaces within a 4-block radius—during the peak hour that the Property would be utilized.  Bayonne Muslims further demonstrated that the strict application of the zoning regulation would result in exceptional and undue hardship since the organization would effectively be barred from exercising its First Amendment rights.  Moreover, Bayonne Muslims established that the purposes of the MLUL in promoting the public morals and general welfare would be advanced by a deviation from the Zoning Ordinance requirement and that the benefits of the deviation would substantially outweigh any detriment.

115.    Indeed, the majority of the Zoning Board commissioners agreed that Bayonne Muslims satisfied the criteria necessary for a parking variance.  For instance, Commissioner Clifford Adams observed that "the exclusive use [of the prayer hall] during worship service in fact reduces the parking deficiency, since the other areas of the center that are included in the overall parking requirement will not be used."  Commissioner Vincent LeFante similarly noted, "I don't know where you go in Hudson County and find a parking spot, nowhere.  So no matter where, if you take this application and bring it somewhere else, that's going to come up as an issue.  You're still going to have to come in front of the board for a variance because there is no

---

[21] N.J. Stat. § 40:55D-9(a).

parking in the city, there just isn't any place.  I don't think it's going to have a negative impact on this application and the town."

116.    The Zoning Board's decision to not grant a variance as to parking—assuming one was even required—was also discriminatory in that the Zoning Board treated Bayonne Muslims differently and less favorably than other houses of worship and refused to grant a variance that it had routinely granted to Christian churches.

117.    Specifically, as noted above, in 2011, the Virgin Mary and St. John Coptic Orthodox Church sought a variance as to parking in connection with its expansion project.  As also noted above, the church was required to provide 58 spaces, as calculated by the Zoning Board.  The applicant provided *zero* parking spaces.  The Zoning Board noted that the applicant's traffic expert had testified "that there were a number of spots within the immediate vicinity of this facility by count" and that "there would be no negative impact as to a result of the parking required for this site.  Further, the expert testified "that nearby parking lots are available to accommodate the peak parking demands of the proposed Church at meeting hour times . . . ." The Zoning Board also noted that the applicant's architect testified that "the applicant used its best efforts to pursue off street parking" and "that the applicant would accept as a condition a written parking agreement" with a nearby lot that would provide parking for the church's congregants.

118.    The Zoning Board granted the variance request, finding that the "the applicant has demonstrated that the proposed variances present an opportunity for improved zoning and planning that will benefit the community and will effectuate the goals of the City as reflected in the zoning ordinance and the 2000 Master Plan."   The Zoning Board specifically noted that "[t]here are a number of potential impacts from the proposed project upon adjacent properties,

such as . . . parking issues."  However, the Zoning Board was satisfied with "the condition that the applicant provide an agreement for parking [that] will help alleviate this impact."  The agreement that the applicant eventually struck with a local parking lot provided for substantially less parking than the 58 parking spaces calculated by the Zoning Board.  As to Bayonne Muslims, the Zoning Board refused to grant a variance despite the organization's agreement to abide by numerous conditions detailed above.

119.    Further, in 2012, the Zoning Board granted a parking variance to the Iglesia Ni Cristo.  As noted above, the Zoning Board found that the church was required to provide 53 parking spaces under the Zoning Ordinance, but permitted it to provide only 37.  Despite the fact that Bayonne Muslims sought a variance that was substantially similar to Iglesia Ni Cristo (assuming that the Zoning Board's calculation as to Bayonne Muslims was correct), the Zoning Board denied it a parking variance.

120.    The Zoning Board treated Bayonne Muslims differently and less favorably than Iglesia Ni Cristo and the Virgin Mary and St. John Coptic Orthodox Church because it gave these two churches a parking variance but denied the same variance to Bayonne Muslims.

121.    The Zoning Board's parking determination as to Bayonne Muslims also does not comport with RLUIPA.  The Zoning Board did not achieve any compelling governmental interest implicated in its ruling, nor did it act using the least restrictive means.  The Zoning Board had at its disposal several less restrictive means given the various accommodations Bayonne Muslims had already offered—e.g., granting a variance subject to the condition that Bayonne Muslims cannot use any other room in the Property at the time prayer services are conducted inside the prayer hall, granting a variance subject to a condition that *Jumma* prayer services be split, or granting a variance subject to the condition that Bayonne Muslims provide

50

for a shuttle van to transport congregants to and from a municipal parking lot where they could

park their cars.  It chose instead to prohibit Bayonne Muslims from building a mosque.

### 3.    Denial of Curb Cut Width and Parking Area Set-Back Variances

122.    Under Bayonne's Zoning Ordinance, the driveway curb cut cannot exceed 10 feet

in width.[22]  Bayonne Muslims required a variance with respect to this requirement because the

driveway curb cut at the Property—which is a preexisting condition—is 30 feet.  The Zoning

Ordinance also requires that no parking area be located closer than 5 feet from any street right-

of-way.[23]  Bayonne Muslims required a variance with respect to this requirement because the

parking area at the Property is 3 feet away from the right-of-way on East 24 Street.

123.    At the Zoning Board hearings, Bayonne Muslims demonstrated that these

variances should be granted.  For instance, Bayonne Muslims' planner John McDonough

testified that the "applicant is working with the land that's been given.  Essentially, this is going

to be an improvement over the existing condition.  The applicant is going to have a nice

channelized access to the site. . . .  And overall, the end product from a physical planning

standpoint is going to be site betterment."  The Zoning Board did not question Bayonne

Muslims' experts and representatives about either of these two variances, and there was no

testimony or evidence offered that contradicted or undermined the testimony provided by

Bayonne Muslims' representatives and experts.

124.    Nonetheless, the Zoning Board denied the requested variance reliefs.  Its decision

does not comply with New Jersey law.  Specifically, the variance requests were deemed denied

despite the fact that Bayonne Muslims only needed a simple majority vote with respect to these

---

[22] Zoning Ordinance § 35-17.5(a).

[23] Zoning Ordinance § 35-17.5(c)(2).

variances, which they received.  Further, to the extent approval by a super majority was required—and it was not—Bayonne Muslims should have been granted these variances because the organization satisfied the criteria for a "c" variance under the MLUL.  The Zoning Board's decision also does not comply with RLUIPA because there is no compelling governmental interest—and the Zoning Board did not identify one—in requiring a 10-foot curb cut and a 5-foot parking setback.  And even if there was a compelling governmental interest in these requirements, the Zoning Board could have addressed such an interest through less restrictive means than denying Bayonne Muslims' application for a mosque.

**H.      Individualized Assessment and Impact on Interstate Commerce**

125.    The substantial burdens on Bayonne Muslims discussed above were imposed in the implementation of a system of land use regulations, under which a government makes, or has in place procedures or practices that permit the government to make, individualized assessments of proposed uses for property.

126.    Portions of Bayonne Muslims' funds expended on purchase of the Property, as well as payments to its professionals related to the Zoning Board proceedings described herein, were transferred by means of financial institutions located outside the State of New Jersey, as well as through the use of interstate wires.  The construction of Bayonne Muslims' proposed mosque will affect interstate commerce, including through payment to those constructing the mosque; purchase of materials necessary to build the mosque; use of interstate highways for the transportation of persons and materials used to construct the mosque; and other activities related to the construction of the mosque.  If built, Bayonne Muslims' mosque will affect interstate commerce by or through, amongst other things, the employment of any part- or full-time employees that will use modes of transportation affecting interstate commerce, and the purchase of goods and services related to the mosque's ongoing operations and maintenance in a manner

52

that will affect interstate commerce.

## FIRST CAUSE OF ACTION

**Violation of the Religious Land Use and Institutionalized Persons Act of 2000
42 U.S.C. § 2000cc(a) – "Substantial Burden"
(Against All Defendants)**

127.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 126.

128.    Section 2(a) of RLUIPA prohibits municipal governments from imposing or implementing land use regulations in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

129.    Defendants have deprived and continue to deprive Plaintiffs of their rights to free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations that place a substantial burden on their religious exercise without a compelling governmental interest and without using the least restrictive means of achieving any interest.

130.    Plaintiffs have suffered damages as a result of the improper actions of Defendants in violation of RLUIPA.

131.    Plaintiffs are entitled to declaratory and injunctive relief.

132.    Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

**Violation of the Religious Land Use and Institutionalized Persons Act of 2000
42 U.S.C. § 2000cc(b)(2) – "Non-Discrimination"
(Against All Defendants)**

133.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 132.

53

9665173

134.     Section 2(b)(2) of RLUIPA prohibits municipal governments from imposing or implementing land use regulations in a manner that discriminates against any assembly or institution on the basis of religion or religious denomination.

135.     Defendants have violated RLUIPA, by implementing land use regulations in a manner that intentionally discriminates against Plaintiffs on the basis of religion.  Among other things, Defendants exercised their zoning powers to deny Plaintiffs' application to build a mosque because it would have been a Muslim house of worship and on the basis of community opposition grounded in anti-Muslim animus.  Defendants also treated Plaintiffs' application differently from prior applications advanced by houses of worship of other faiths on the basis of religion.  Such disparate treatment of Plaintiffs' application violates the anti-discrimination provision in Section 2(b)(2) of RLUIPA.[24]

136.     Plaintiffs have suffered damages as a result of the unlawful actions of the Defendants in violation of RLUIPA.

137.     Plaintiffs are entitled to declaratory and injunctive relief.

138.     Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Violation of the Religious Land Use and Institutionalized Persons Act of 2000 42 U.S.C. § 2000cc(b)(3)(B) – "Total Exclusion" or "Unreasonable Limitations" (Against all Defendants)

139.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 138.

140.     Section 2(b)(3)(B) of RLUIPA prohibits municipal governments from imposing or implementing land use regulations in a manner that totally excludes or unreasonably limits

---

[24] 42 U.S.C. § 2000cc(b)(2).

religious assemblies, institutions, or structures within a jurisdiction.

141.    Defendants have violated RLUIPA, by imposing and implementing land use regulations, *to wit*, Zoning Ordinance §§ 35-5.28(1) and 35-17.6(b)(2).  In the aggregate, these regulations require houses of worship to provide (a) a lot that is at least 20,000 square feet in area, (b) a 30-foot setback from any property line, (c) a 30-foot landscaped buffer strip along each adjacent property line consisting of plantings at least 5 feet, and (d) 1 parking space for every 4 seats in the main auditorium or its equivalent, as well as—to the extent the Court interprets the Zoning Ordinance as such—additional parking spaces for areas other than the main auditorium or its equivalent even where the applicant has agreed to not use such areas at the time the auditorium or its equivalent is being utilized.  In their totality, these regulations totally exclude or unreasonably limit religious assemblies, institutions, or structures within Bayonne.

142.    Plaintiffs have suffered damages as a result of the improper actions of the Defendants in violation of RLUIPA.

143.    Plaintiffs are entitled to declaratory and injunctive relief.

144.    Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Violation of the United States Constitution
### Free Exercise of Religion:  First and Fourteenth Amendments
### 42 U.S.C. § 1983
### (Against All Defendants)

145.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 144.

146.    The First Amendment of the United States Constitution, as incorporated through the Fourteenth Amendment, prohibits a state or any political subdivision thereof from prohibiting the free exercise of religion (the "Free Exercise Clause").

147.    In committing the acts alleged above, the Defendants were acting under color of state law.

148.    The actions of the Defendants have violated and continue to violate Plaintiffs' rights under the Free Exercise Clause by imposing a substantial burden upon the religious exercise of Plaintiffs and by intentionally discriminating against Plaintiffs on the basis of religious belief.  The substantial burden has been imposed by the discriminatory and arbitrary denial of Plaintiffs' application for site plan approval through the discretionary enforcement of a system of regulations that allows for individualized assessments of land use proposals.

149.    Defendants discriminated against Plaintiffs by denying Plaintiffs' application for a conditional use variance and other variances based on discriminatory animus towards Plaintiffs' religion.

150.    Plaintiffs have suffered injury as a result of the illegal and unconstitutional actions of the Defendants.

151.    Plaintiffs are entitled to a declaratory judgment that the Defendants' conduct has violated their First and Fourteenth Amendment rights.

152.    Plaintiffs are entitled to injunctive relief.

153.    Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

**Violation of the New Jersey Constitution
Free Exercise of Religion:  Article I, Paragraph 3
N.J.S.A. § 10:6-2
(Against All Defendants)**

154.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 153.

155.    Article I, Paragraph 3 of the New Jersey Constitution guarantees the free exercise

9665173

of religion.

156.     The actions of the Defendants have violated and continue to violate Plaintiffs' rights under the New Jersey Constitution by imposing a substantial burden upon the religious exercise of Plaintiffs and by intentionally discriminating against Plaintiffs on the basis of religious belief.  The substantial burden has been imposed by the discriminatory and arbitrary denial of Plaintiffs' application for site plan approval through the discretionary enforcement of a system of regulations that allows for individualized assessments of land use proposals.

157.     Defendants discriminated against Plaintiffs by denying Plaintiffs' application for a conditional use variance and other variances based on discriminatory animus towards Plaintiffs' religion.

158.     Plaintiffs have suffered injury as a result of Defendants' illegal actions.

159.     Under N.J.S.A. § 10:6-2, Plaintiffs are entitled to declaratory and injunctive relief, as well as civil damages and fines from Defendants.

## SIXTH CAUSE OF ACTION

### Violation of the United States Constitution
### Fourteenth Amendment:  Equal Protection
### 42 U.S.C. § 1983
### (Against All Defendants)

160.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 159.

161.     The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits a state or any political subdivision thereof from denying to any person within its jurisdiction the equal protection of the laws.

162.     In committing the acts alleged above, the Defendants were acting under color of state law.

163.     The actions of the Defendants have violated and continue to violate Plaintiffs'

9665173

rights under the Equal Protection Clause by intentionally treating Plaintiffs differently from other

entities on the basis of religious belief.  Among other things, Defendants implemented the City's

Zoning Ordinance in a manner that intentionally discriminated on the basis of Plaintiffs' religion

and was different and substantially more burdensome than the implementation of the City's

Zoning Ordinance as to other religious organizations.

164.     Plaintiffs have suffered injury as a result of the actions of the Defendants in

violation of the Equal Protection Clause.

165.     Plaintiffs are entitled to a declaratory judgment that the Defendants' actions have

violated Plaintiffs' rights under the Equal Protection Clause.

166.     Plaintiffs are entitled to injunctive relief mandating that Plaintiffs' application for

site plan approval be granted forthwith.

167.     Defendants are liable in damages to Plaintiffs in an amount to be determined at

trial.

### SEVENTH CAUSE OF ACTION

**New Jersey Constitution
Article I, Paragraphs 1 & 5:  Equal Protection
N.J.S.A. § 10:6-2
(Against All Defendants)**

168.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 167.

169.     The New Jersey Constitution, Paragraphs 1 and 5, entitles all persons to equal

protection of the law ("State Equal Protection Clause").

170.     Defendants' actions have violated and continue to violate Plaintiffs' rights under

the State Equal Protection Clause by intentionally treating Plaintiffs differently from other

entities on the basis of religious belief.  Among other things, Defendants implemented the City

of Bayonne's Zoning Ordinance in a manner that intentionally discriminated on the basis of

Plaintiffs' religion and was different and substantially more burdensome than the implementation

of the City of Bayonne's Zoning Ordinance as to other religious organizations.

171.     Plaintiffs have suffered injury as a result of the Defendants' actions in violation of

the State Equal Protection Clause.

172.     Under N.J.S.A. § 10:6-2, Plaintiffs are entitled to a declaratory judgment that the

Defendants' actions have violated Plaintiffs' rights under the State Equal Protection Clause.

173.     Under N.J.S.A. § 10:6-2, Plaintiffs are entitled to injunctive relief mandating that

Plaintiffs' application for site plan approval be granted forthwith.

174.     Defendants are liable in damages to Plaintiffs in an amount to be determined at

trial.

### EIGHTH CAUSE OF ACTION

**New Jersey Municipal Land Use Law**
**Arbitrary, Capricious, or Unreasonable Land Use Decision**
**(N.J.S.A § 40:55D-1, *et seq.*; *Coventry Square vs. Westwood Zoning Board of Adjustment*, 138**
**N.J. 285 (1994)**
**(Against Defendant Zoning Board)**

175.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 174.

176.     N.J.S.A. § 40:55D-1, *et seq.*, and New Jersey common law prohibit a municipal

zoning board from exercising its land use powers in a manner that is arbitrary, capricious, or

unreasonable and not supported by substantial evidence.

177.     The actions of Defendant Zoning Board in hearing and denying Plaintiffs'

application for variance relief were arbitrary, capricious, and unreasonable and not supported by

substantial evidence.  Moreover, the legal rules applied by the Zoning Board to guide its

deliberations were arbitrary, capricious, and unreasonable as a matter of law in that they were

inconsistent with the MLUL and case law thereunder.

178.     Plaintiffs have suffered injury as a result of the unlawful actions of Defendant

Zoning Board.

179.    Under N.J.S.A. § 40:55D-1, *et seq.*, and New Jersey common law, Plaintiffs are entitled to declaratory and injunctive relief against Defendant Zoning Board.

**NINTH CAUSE OF ACTION**
**(PLEADED IN THE ALTERNATIVE)**

**Violation of the United States Constitution**
**Fourteenth Amendment:  Due Process**
**42 U.S.C. § 1983**
**(Against All Defendants)**

180.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 179.

181.    The Due Process Clause of the Fourteenth Amendment prohibits statutes that fail to provide people of ordinary intelligence a reasonable opportunity to understand the conduct governed by the statute.  Further, under Supreme Court precedent interpreting the Due Process Clause, statutes must provide explicit standards for those who apply them to avoid resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

182.    Section 35-17.6(b)(2) of Bayonne's Zoning Ordinance requires that for a church or temple, the applicant must provide 1 parking space for "4 seats in the main auditorium or their equivalent."  On its face, the Zoning Ordinance does not require any house of worship to provide parking spaces for other rooms or spaces contained in the house of worship.  Accordingly, the Zoning Board's parking determination requiring more parking from Bayonne Muslims that than required by the 1:4 ratio violated the terms of the Zoning Ordinance.

183.    In the alternative, to the extent Section 35-17.6(b)(2) is interpreted to require a house of worship to provide parking spaces for rooms or spaces other than the auditorium (or its equivalent) contained in the house of worship, the statute violates the Due Process Clause of the Fourteenth Amendment because it fails to provide members of the public, including Plaintiffs, a

60

reasonable opportunity to ascertain the number of parking spaces required for a particular use, including mosques.  The constitutional flaws in Section 35-17.6(b)(2) resulted in an arbitrary and discriminatory application with respect to Plaintiffs.  In committing the acts alleged above, the Defendants were acting under color of state law.

184.   Plaintiffs are entitled to a declaratory judgment that Section 35-17.6(b)(2) of Bayonne's Zoning Ordinance violates the Due Process Clause of the Fourteenth Amendment if it is interpreted to require a house of worship to provide parking spaces for rooms other than the auditorium (or its equivalent).

## TENTH CAUSE OF ACTION
### (PLEADED IN THE ALTERNATIVE)

### Violation of the New Jersey Constitution
### Article I, Paragraph 1:  Protection Against Injustice
### N.J.S.A. § 10:6-2
### (Against All Defendants)

185.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 184.

186.   Article I, Paragraph 1 of the New Jersey Constitution provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  Under New Jersey Supreme Court precedent, this provision seeks to protect against injustice and safeguard the principles of due process.

187.   Section 35-17.6(b)(2) of Bayonne's Zoning Ordinance requires that for a church or temple, the applicant must provide 1 parking space for "4 seats in the main auditorium or their equivalent."  On its face, the Zoning Ordinance does not require any house of worship to provide parking spaces for other rooms or spaces contained in the house of worship.  Accordingly, the Zoning Board's parking determination requiring more parking from Bayonne Muslims that than

61

required by the 1:4 ratio violated the terms of the Zoning Ordinance.

188.   In the alternative, to the extent Section 35-17.6(b)(2) is interpreted to require a house of worship to provide parking spaces for rooms or spaces other than the auditorium (or its equivalent) contained in the house of worship, the statute violates the Article I, Paragraph 1 of the New Jersey Constitution because it fails to provide members of the public, including Plaintiffs, a reasonable opportunity to ascertain the number of parking spaces required for a particular use, including mosques.  The constitutional flaws in Section 35-17.6(b)(2) resulted in an arbitrary and discriminatory application with respect to Plaintiffs.

189.   Plaintiffs are entitled to a declaratory judgment that Section 35-17.6(b)(2) of Bayonne's Zoning Ordinance violates Article I, Paragraph 1 of the New Jersey Constitution if it is interpreted to require a house of worship to provide parking spaces for rooms other than the auditorium (or its equivalent).

## PRAYER FOR RELIEF

Plaintiffs pray for judgment in their favor and the following relief:

a) An Order finding and declaring that the Zoning Board's April 17, 2017 resolution denying Bayonne Muslims' application for variance relief violates RLUIPA as to Plaintiffs and is, therefore, null and void;

b) An Order finding and declaring that Zoning Board's April 17, 2017 resolution denying Bayonne Muslims' application for variance relief is unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution and is, therefore, null and void;

c) An Order finding and declaring that the Zoning Board's April 17, 2017 resolution denying Bayonne Muslims' application for variance relief is unconstitutional under the New Jersey Constitution and is, therefore, null and void;

d) An Order finding and declaring that the Zoning Board's April 17, 2017 resolution denying Bayonne Muslims' application for variance relief is arbitrary, capricious, and unreasonable under the New Jersey MLUL and is, therefore, null and void;

e) To the extent Section 35-17.6(b)(2) of Bayonne's Zoning Ordinance is interpreted to require a house of worship to provide parking spaces for rooms or spaces other than the auditorium (or its equivalent), an Order finding and declaring that Section 35-17.6(b)(2) is unconstitutional under the U.S. and New Jersey Constitutions and is, therefore, null and void;

f) Preliminary and final injunctions restraining Defendants from impeding Plaintiffs' efforts to develop a mosque and community center at 109 East 24 Street, Bayonne consistent with submissions made to the Zoning Board as of March 6, 2017;

g) Preliminary and final injunctions ordering Defendants to grant, forthwith and no more than 10 days from the date of the Court's Order, both preliminary and final approval to Plaintiffs' site plan and related submissions made to the Zoning Board as of March 6, 2017;

h) Appointment of a federal monitor to oversee Defendants' implementation and compliance with this Court's remedial orders, as well as Defendants' continuing compliance with federal law in all decisions of the City of Bayonne and the Zoning Board for a period of five years;

i) An Order mandating training for each and every one of Defendants' officials and agents engaged in the implementation of land use regulations as to the requirements and obligations imposed on state and municipal actors by RLUIPA, the U.S. Constitution, and the New Jersey Constitution;

j) Compensatory damages in an amount to be determined at trial and other appropriate relief to be determined at trial; and

k) An award of reasonable attorney's fees under 42 U.S.C. § 1988 in an amount to be determined by the Court.

9665173

Dated:  May 25, 2017

        Respectfully submitted,

        By:      s/  Matthew Funk

           Matthew Funk (NJ Bar # 04392210)

        Adeel A. Mangi
        Muhammad U. Faridi
        Peter Shakro
        (*pro hac vice* applications to be submitted)
        **PATTERSON BELKNAP WEBB & TYLER LLP**
        1133 Avenue of the Americas
        New York, New York 10036
        Telephone No.:  (212) 336-2000
        Facsimile No.:  (212) 336-2222

        *Attorneys for Plaintiffs Bayonne Muslims, Abdul
Hameed Butt, and Khaled Aly*

64

## CERTIFICATIONS

In accordance with Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration, or administrative proceeding.

In accordance with Local Civil Rule 201.1(d)(1) & (2)(A), I certify that this matter is not subject to compulsory arbitration or to mediation because this action is based on an alleged violation of a right secured by the Constitution of the United States, and because the relief sought does not consist of only money damages not in excess of $150,000, exclusive of interest and costs, and any claim for punitive damages.

Dated:  May 25, 2017

By:  ____s/  Matthew Funk_____

Matthew Funk (NJ Bar # 04392210)

Adeel A. Mangi
Muhammad U. Faridi
Peter Shakro
(*pro hac vice* applications to be submitted)
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036
Telephone No.:  (212) 336-2000
Facsimile No.:  (212) 336-2222

*Attorneys for Plaintiffs Bayonne Muslims, Abdul Hameed Butt, and Khaled Aly*

1